John Eugene KNIESS, Appellant,

v.

UNITED STATES of America, Appellee.

No. 22514.

United States Court of Appeals Ninth Circuit.

July 8, 1969.

John E. Kniess, pro per.

Edward E. Davis, U. S. Atty., Lawrence Turoff, Asst. U. S. Atty., Phoenix, Ariz., for appellee.

Before DUNIWAY, ELY, and HUFSTEDLER, Circuit Judges.

ELY, Circuit Judge:

The appellant's arrest in Phoenix, Arizona, terminated an escapade in which he had passed a series of bogus postal money orders in Alabama, Arizona, Colorado, Florida, Kansas, Oklahoma, South Carolina, Tennessee, Texas and Washington. In one state, Washington, he was federally indicted for having unlawfully passed counterfeit "securities" of the United States. 18 U.S.C. § 472.[1] However, federal grand juries in all other affected jurisdictions returned indictments against Kniess for unlawfully passing forged "postal money orders." 18 U.S.C. § 500.[2]

Kniess ultimately agreed to plead guilty to the charges in all twelve indictments, and all actions were removed to the Arizona District Court for disposition pursuant to Rule 20 of the Federal Rules of Criminal Procedure. The District Court sentenced Kniess to three concurrent ten-year terms for each count in the Washington section 472 indictment and to concurrent maximum five-year terms for each count in the remaining eleven indictments which charged violation of section 500.[3]

Thereafter, the appellant, proceeding in forma pauperis and under 28 U.S.C. § 2255, moved to vacate his sentence. He insisted, as he had prior to agreeing to plead guilty to the Washington indictment, that section 472 does not proscribe the activities for which he was sentenced: Passing and uttering forged postal money orders. He did not, however, challenge the propriety of the sentences imposed on the offenses charged under section 500. The District Court, which had initially sentenced the appellant, denied relief without conducting an evidentiary hearing. This appeal followed. 28 U.S. C. § 1291.

The Government's argument in support of Kniess' indictment, conviction, and sentence under section 472 rests upon one theory: If a single act violates two statutes, the Government may elect to prosecute under either one. For the proposition, it cites Hutcherson v. United States, 120 U.S.App.D.C. 274, 345

---

1. Section 472 provides:
   "Whoever, with intent to defraud, passes, utters, publishes, or sells, or attempts to pass, utter, publish, or sell, or with like intent brings into the United States or keeps in possession or conceals any falsely made, forged, counterfeited, or altered obligation or other security of the United States, shall be fined not more than $5,000 or imprisoned not more than fifteen years, or both."

2. Section 500 provides, in part:
   "Whoever, with intent to defraud, passes, utters or publishes, any such forged or altered money order or postal note, knowing any material signature or indorsement thereon to be false, forged, or counterfeited, or any material alteration therein to have been falsely made; * * *."

3. Kniess also plead guilty to violation of 18 U.S.C. § 641 for which he was sentenced to a concurrent one-year term; however, he has not challenged the validity of this conviction.

F.2d 964, cert. denied, 382 U.S. 894, 86 S.Ct. 188, 15 L.Ed.2d 151 (1965). Hence, it urges us to hold: (1) That both statutes, section 472 prescribing a maximum fifteen-year penalty and section 500 providing a maximum five-year sentence, govern the appellant's actions in Washington, and (2) That the federal prosecutor in Washington was empowered to determine under which statute to proceed. Adoption of this position is premised upon a narrow, literal reading of section 472: Since this section outlaws passing or uttering a counterfeit "obligation or other security of the United States," and since Congress defines "obligation or other security" as "bills, checks, or drafts for money, drawn by or upon authorized officers of the United States," 18 U.S.C. § 8, money orders fall, literally, within the terms of the statute. However, our review of the relevant legislative history convinces us that this interpretation would be improper, that section 500, not section 472, governs, and hence, that the federal authorities in Washington did not have the choice which the Government claims.

Initially, we must analyze the significance, if any, of the different language which is contained in the two statutes. Section 500 prohibits the passing of bogus postal notes while "knowing any material signature or indorsement thereon to be false, forged, or counterfeited, or any material alteration therein to have been falsely made." Section 472, however, makes no comparable specific reference to guilty knowledge.

> "Whoever with intent to defraud, passes * * * any falsely made, forged, counterfeited, or altered obligation or other security of the United States * * *."

From this, it might be said that we should infer that Congress intended that one should not be convicted under section 500 for passing a counterfeited money order with an intent to defraud without specific proof of his knowledge of a false signature, a false endorsement, or material alteration of the money order, whereas, absent such proof, if the offender nevertheless possessed the illicit intent, he might be convicted under section 472.

Inferences as to possible legislative intent drawn from such variations in statutory terminology are of questionable validity. The phrases employed by one legislative draftsman are an unreliable clue as to that which another writer, at a different point in time, but seeking similar results, may have intended by the use of slightly different terms. Both statutes prohibit the passing of counterfeit instruments. Surely, one passing a fraudulent instrument with the fraudulent intent specified in section 472 would know why his act is fraudulent. Therefore, it is not conceivable that an accused could pass a counterfeited postal order with section 472's requisite intent without awareness of at least one of the fraudulent factors specified in section 500. This being true, it is possible to infer that the knowledge required by section 500 may be equated with the fraudulent intent specified in section 472, despite the variation in terminology. Moreover, section 500 provides a lesser penalty than section 472; hence, to hold that the two sections do not govern the same acts would so implement the statutory framework that the more evident and specific one's guilty knowledge the less severe his potential penalty! We have discovered no comparable case involving two penal statutes interpreted or devised to operate in such a fashion; hence, the anomalous result which would follow such an interpretation argues persuasively against its validity.

We turn then to the Government's argument that both statutes proscribe Kniess' criminal acts—a position which, as we have explained, is grounded upon a literal reading of section 472. It is all too obvious that reasonable interpretation often cannot depend upon a process of careful literalism. Words, phrases, and sentences of particular statutes derive their meaning from their peculiar contexts. This is the case here. The historical development of the two statutes, despite the Government's fine

literalism to the contrary, persuades us that section 472 does not govern money order fraud.

The initial legislation dealing with counterfeit "securities" of the United States was enacted by the First Congress. By an Act of April 30, 1790, 1 Stat. 112, 115, ch. 9, § 14, entitled "An Act for the Punishment of certain Crimes against the United States," it was provided:

"Sec. 14. *And be it [further] enacted,* That if any person or persons shall falsely make, alter, forge or counterfeit, or cause or procure to be falsely made, altered, forged, or counterfeited, or willingly act or assist in the false making, altering, forging or counterfeiting any certificate, indent, or other public security of the United States, or shall utter, put off, or offer, or cause to be uttered, put off, or offered in payment or for sale any such * * * certificate, indent, or other public security, with intention to defraud any person, knowing the same to be false, altered, forged or counterfeited, and shall be thereof convicted, every such person shall suffer death."

Thereafter, by Act of March 3, 1823, 3 Stat. 771, ch. 38, § 1, Congress lessened the penalty for such fraud from death to either hard labor from one to ten years, or imprisonment for not more than five years, and a fine not exceeding $1,000.00. Two years later, Congress again proscribed such forgery. The most salient aspect of this legislation was the language which Congress employed to define "security." Not only are those terms strikingly similar to those presently employed by 18 U.S.C. § 8 to establish the scope of section 472, but also, they would have literally included postal money orders covered by statutes which were subsequently adopted.

"[A]ny paper, writing, or instrument, in imitation of, or purporting to be, an indent, certificate of public stock, or debt, treasury note, or other public stock, or debt, treasury note, or other public security of the United States, * * * or any bill, check, or draft for money drawn by, or on the treasurer of the United States, or by, or on, any other public officer or agent of the United States, duly authorized to make, draw, accept, or pay the same, on behalf and for account of the United States, * * *."

Act of March 3, 1825, 4 Stat. 115, 119, ch. 65, § 17.

Finally, in 1862, just two years before the original money order legislation, Congress again amended these forgery provisions. Act of February 25, 1862, 12 Stat. 345, 347–348, ch. 33, § 6. Apparently, the ten-year maximum term prescribed in 1825 was thought to be inadequate, for the 1862 legislation increased the penalties for the specified offenses to a maximum fifteen years' confinement.

This was the historical context in which Congress established the Nation's money order system. In assessing the initial legislation's significance to our problem, the remarks of Congressman Alley, who was the principal advocate of a national postal order system, are especially pertinent. Before the system's adoption, Mr. Alley carefully explained the limited objectives of the proposed system to his colleagues and emphasized the fact that the money order concept was theretofore unknown in the States. Nevertheless, he assured his fellow Congressmen that, based upon the European experience, the proffered bill would provide a complete means of safeguarding the system's laudable objectives.

"It [the postal money order system] furnishes a safe means of conveying to every section of the country remittances of small amount for a trifling consideration, which every person must admit is a great desideratum. A large amount is lost annually in small sums by sending money through the mails. In most instances these losses fall upon people of moderate means, and this bill provides a complete remedy for this growing evil."

Cong.Globe, 38th Cong. 1st Sess., 1659 (1864) (remarks of Mr. Alley). Following these assurances, Congress enacted

the entire bill on May 17, 1864, 13 Stat. 76, ch. 87. This overall legislative scheme included a statute specifically dealing with money order fraud.

"Sec. 12. *And be it further enacted,* That if any person shall falsely make, forge, counterfeit, engrave, or print, or cause or procure to be falsely made, forged, counterfeited, engraved, or printed, or willingly aid, or assist in falsely making forging, counterfeiting, engraving, or printing any order in imitation of or purporting to be a money-order issued by one postmaster upon another postmaster; * * * or shall pass, utter, or publish, or attempt to pass, utter, or publish, as true, any falsely altered money-order, issued as aforesaid, knowing the same to be falsely altered, with an intent to defraud, every such person shall be deemed and adjudged guilty of felony, and being thereof convicted, shall be sentenced to be imprisoned and kept at hard labor for a period of not less than three years, nor more than ten years, and be fined in a sum not exceeding five thousand dollars."

Act of May 17, 1864, 13 Stat. 76, 78–79, ch. 87, § 12. As we have already emphasized, however, Congress had previously, in 1825, enacted legislation which, but for the later specific proscription, would have been applicable to money order forgery and which, only two years before the creation of the postal order system, had been amended to provide a fifteen-year penalty. In light of this fact, there are but two explanations why Congress decided to include specific provisions applicable to postal money order fraud in its 1864 legislation. First, since money orders were a new concept to the lawmakers, they might have considered them to be somewhat different from the "securities" with which their previous legislation was concerned. Hence, in spite of what would be literally true under present-day definitions, the Congress may have believed that its previous legislation would not cover money order fraud. Alternatively, Congress may have believed that money order fraud presented problems different from those then arising from the forgery of other forms of United States "securities" and therefore determined that these problems required separate attention.

The second explanation is the more plausible. Only two years before, Congress had increased the maximum penalty for fraud relating to United States obligations and securities. However, when Congress enacted its money order fraud provisions, it called for different treatment—a ten-year maximum penalty. Unfortunately, the legislative history yields no clue as to why Congress decided to treat money order forgery differently. Perhaps, since the maximum amount of a single money order could not then exceed thirty dollars, Congress believed the potential threat posed by money order forgery was less severe than fraud connected with other forms of United States currency. Nevertheless, regardless of the reasons which prompted this disparate treatment, the 1864 Congress obviously considered postal order forgery to be, for penalty purposes, a different type of offense against the Government.

Not insignificantly, present-day statutes continue to provide less severe penalties for money order forgery,[4] and there is nothing in their historical development which indicates that this distinction is without purpose. Immediately following the 1864 creation of the postal order system, Congress authorized additional United States notes and bonds. This legislation provided a fifteen-year maximum penalty for fraud related to the new instruments as well as that pertaining to existing instruments. It adopted the terminology of the 1825 legislation so

4. Section 472, which proscribes forgery of United States obligations and securities, presently provides a maximum penalty of $5,000.00 fine and fifteen years imprisonment; whereas, section 500, which governs money order fraud, allows a maximum penalty of $5,000.00 fine and five years imprisonment. *See* notes 1–2, *supra.*

that, like that "securities" legislation, it could be interpreted as including money orders and thereby increasing the penalties for money order fraud.

> "[A]ll bonds, coupons, national currency, United States notes, treasury notes, fractional notes, checks for money of authorized officers of the United States, certificates of indebtedness, certificates of deposit, stamps, and *other representatives of value* of whatever denomination, which have been or may be issued under any act of congress."

Act of June 30, 1864, 13 Stat. 218, 222, ch. 172, § 13.

We cannot believe that this enactment can be properly interpreted as referring to money orders. First, since it was adopted only forty-three days after creation of the postal order system, it is unreasonable to infer, from the literal language alone, that Congress had so quickly decided to increase its penalties for postal order fraud. Second, since Congress acted to reduce its penalties for money order forgery shortly, only four years, thereafter, any inference that the 1864 legislation sought to effect an increase of these penalties becomes more untenable. The 1868 reduction of the penalties was effected by the following:

> "Sec. 5. *And be it further enacted,* That if any person shall falsely forge or counterfeit, or willingly aid, assist, or abet in falsely forging or counterfeiting, or shall procure, directly or indirectly, to be falsely forged or counterfeited any postal money order, or any material signature or endorsement to any postal money order issued by the Post-Office Department, or any of its agents, for the purpose and with the intent of obtaining or receiving, directly or indirectly, or of procuring or enabling others to obtain or receive, *directly or indirectly, any sum or sums of money,* and thereby to defraud either the United States or any person of such *sum or sums of money, or any part* thereof, or shall pass, utter, or publish or attempt to pass, utter, or

publish as true, any such forged or counterfeited postal money order with intent to defraud either the United States or any person of any sum or sums of money, knowing such postal money order, or any signature or endorsement thereon to be so falsely forged or counterfeited, every such person shall be deemed guilty of felony, and being thereof duly convicted shall be sentenced to be imprisoned and kept at hard labor for a period of not less than two years *nor more than five years,* and to be fined in a sum not exceeding five thousand dollars."

Act of June 27, 1868, 15 Stat. 194, 195, ch. 246 § 5 (emphasis added). See also Act of June 8, 1872, 17 Stat. 283, 298–299, ch. 335, § 116.

Third and finally, if Congress had intended any effect upon the initial money order provisions, the change would have been reflected in the Revised Statutes of 1873–74. The statutes were the ultimate product of an Act of June 27, 1866, 14 Stat. 74, ch. 140, § 1, which authorized three commissioners "to revise, simplify, arrange, and consolidate all statutes of the United States, general and permanent in their nature * * *." The report of these commissioners was rejected by Congress because in consolidating the existing statutory law, the commissioners attempted to effect substantive changes in some of its parts. *See* Dwan & Feidler. The Federal Statutes—Their History and Use, 22 Minn.L.Rev. 1008, 1013 (1938); 65 Cong.Rec. 639 (1924) (remarks of Mr. Little). Thereafter, Congress enlisted the services of an attorney, Thomas Durant, to revise the rejected report to insure that it reflected no more than a consolidation of existing statutes. Mr. Durant's Report of December 10, 1873, assured, "Every section reported by the commissioners has been compared with the corresponding text of the act or portion of the act of Congress referred to and whenever it has been found that a section contained any departure from the meaning of Congress as expressed in the Statutes at Large, such change has been made as was necessary

to restore the original signification." H. R.Doc. No 1215, 43d Cong., 1st Sess. § 1 (1873); *see also* Cong. Globe, 43rd Cong., 1st Sess. 129–30 (1874) (remarks of Mr. Butler); Cong. Globe, 43rd Cong., 1st Sess. 4220 (1874) (remarks of Senator Conkling). After careful study, Mr. Durant's report was enacted into law as Revised Statutes.

No change in the money order statutes is indicated by the Revised Statutes. Indeed, they reflected the distinct character of money order forgery which was suggested by the initial postal order legislation of 1864. Section 5431 of Revised Statutes, which proscribed the forgery of "obligations" or "securities" of the United States, was included under the general category of "Forgeries, Frauds, Etc." and read:

> "Every person who, with intent to defraud, passes, utters, publishes, or sells, or attempts to pass, utter, publish, or sell, or brings into the United States with intent to pass, publish, utter or sell, or keeps in possession or conceals with like intent any falsely made, forged, counterfeited, or altered obligation, or other security of the United States, shall be punished by a fine of not more than five thousand dollars, and by imprisonment at hard labor not more than fifteen years."

Meanwhile, that portion of Revised Statutes which proscribed fraud connected with money orders was assigned to a wholly separate chapter entitled "Postal Crimes." More importantly, these proscriptions give absolutely no indication that Congress had altered its original intent to provide less severe penalties for any type of fraud connected with postal orders despite the literal scope of the June 30, 1864, enactment.

> "Any person who shall, with intent to defraud, falsely make, forge, counterfeit, engrave, or print, or cause or procure to be falsely made, forged, counterfeited, engraved, or printed, or willingly aid or assist in falsely making, forging, counterfeiting, engraving, or printing, any order in imitation of or purporting to be a money-order issued by the Post-Office Department, or any of its postmasters or agents, or any material signature or indorsement thereon; any person who shall falsely alter, or cause or procure to be altered, or willingly aid or assist in falsely altering any such money-order; any person who shall, with intent to defraud, pass, utter, or publish, or attempt to pass, utter, or publish, as true, any such false, forged, counterfeited, or altered money-order, knowing the same, or any signature or indorsement thereon, to be false, forged, counterfeited, or altered, shall be punishable by a fine of not more than five thousand dollars, or by imprisonment at hard labor for not less than two years and not more than five years."

Revised Statutes § 5463. Accordingly, it is unreasonable to infer that Congress intended, prior to 1873, to treat money order fraud as the equivalent of forgery related to other forms of United States "securities."

No change was made in the provisions concerning fraud connected with United States "securities" until the adoption of the provisions into the Criminal Code of 1909, 35 Stat. 1088, ch. 321. Prior to this time, however, the postal order forgery proscriptions were amended twice. By Act of January 3, 1887, 24 Stat. 355, ch. 13, § 2, Congress amended Revised Statute § 5463 to insure that its provisions covered fraudulent acts which involved postal notes and money orders of foreign countries. Shortly thereafter, by Act of June 18, 1888, 25 Stat. 187, ch. 394 § 2, Congress amended these provisions once again to reduce the minimum penalty for postal order fraud from two years to one; however, the less severe five-year maximum penalty for postal order fraud was retained. Hence, once more, Congress failed to modify the separate treatment that it apparently intended should be accorded to this type of fraud.

When Congress enacted the 1909 Criminal Code, the distinct quality of money order forgery was again punctuated.

Forgery of United States "securities" was proscribed in a chapter entitled "Offenses against the Currency, Coinage, Etc." See Act of March 4, 1909, 35 Stat. 1115, 1116, ch. 321, § 151, whereas, money order fraud was proscribed as a separate offense under the title "Offenses Against the Postal Service." See Act of March 9, 1909, 35 Stat. 1123, 1131, ch. 321, § 218. More significantly, however, the 1909 Code continued to provide less severe penalties for postal order fraud and ultimately, both provisions were codified into separate sections of Title 18 of United States Code where they are found today without substantial change. Compare Act of June 25, 1948, 62 Stat. 705, ch. 645; Act of June 25, 1948, 62 Stat. 712, ch. 645; 18 U.S.C. § 472; 18 U.S.C. § 500.

All of the foregoing leads to the conclusion that Congress has consistently treated money order forgery as a distinct crime. The most salient feature of this separate treatment is the fact that money order forgery has always been controlled by legislation specifying less severe penalties for money order fraud than those prescribed for fraud relating to other Government securities. Indeed, since 1872, the prescribed maximum penalty of five years' confinement for such fraud has never been changed.

■ Having determined Kniess was not subject to indictment under 18 U.S.C. § 472, we must consider whether, despite reference to section 472, the Washington indictments nevertheless alleged sufficient facts to charge a violation of section 500. See United States v. Hutcheson, 312 U.S. 219, 229, 61 S.Ct. 463, 85 L.Ed. 788 (1941); Prussian v. United States, 282 U.S. 675, 679–681, 51 S.Ct. 223, 75 L.Ed.

610 (1931); United States v. Nixon, 235 U.S. 231, 235, 35 S.Ct. 49, 59 L.Ed. 207 (1914); Johnson v. United States, 206 F.2d 806, 808 (9th Cir. 1953); Vedin v. United States, 257 F. 550, 551 (9th Cir. 1919). Each of the three Washington indictments contains the following language:

"That * * * JOHN EUGENE KNIESS, with intent to defraud, did knowingly and unlawfully pass, utter and publish * * * a falsely made, forged and counterfeited obligation and security of the United States, to wit, a falsely made, forged and counterfeited * * * Postal Money Order."

Clearly, the language charges Kniess with knowingly passing a forged postal money order, an act prohibited by section 500. While the indictments made no reference to the specific knowledge described in section 500,[5] they do charge that Kniess possessed an intent to defraud. This, as we have previously explained, is synonymous with the required knowledge which is specified in section 500. We therefore conclude that each of these indictments alleged all the elements necessary to state an offense under 18 U.S.C. § 500.

Upon remand, the District Court will reduce each sentence imposed under the Washington indictments to the five-year maximum penalty which is prescribed by section 500. See Dunaway v. United States, 170 F.2d 11, 13 (10th Cir. 1948). It will be ordered that two of those sentences run concurrently with the other. The judgments of conviction pursuant to the indictments charging violations of the provisions of 18 U.S.C. § 500, not challenged by Kniess, are not disturbed.

Reversed and remanded.

---

5. The knowledge specified in section 500 reads:

"[K]nowing any material signature or endorsement thereon to be false, forged, or counterfeited, or any material alteration therein to have been falsely made."