UNITED STATES of America, Appellee,

v.

**Rickie Steven ZABEL, Appellant.**

UNITED STATES of America, Appellee,

v.

**James Arthur GUKEISEN, Appellant.**

Nos. 82–1617, 82–1686.

United States Court of Appeals, Eighth Circuit.

Submitted Sept. 16, 1982.

Decided March 16, 1983.

Rehearing and Rehearing En Banc Denied April 22, 1983.

---

Scott C. Petersen, Sioux Falls, S.D., for appellant Zabel.

Philip N. Hogen, U.S. Atty., Bonnie P. Ulrich, Asst. U.S. Atty., Sioux Falls, S.D., for appellee.

N. Dean Nasser, Jr., Sioux Falls, S.D., for appellant Gukeisen.

Before BRIGHT, Circuit Judge, FLOYD R. GIBSON, Senior Circuit Judge, and JOHN R. GIBSON, Circuit Judge.

JOHN R. GIBSON, Circuit Judge.

Rickie Steven Zabel and James Arthur Gukeisen were convicted by a jury of interstate transportation of stolen food stamp coupons in violation of 18 U.S.C. § 2314 and for receipt or sale of stolen food stamp coupons in interstate commerce in violation of 18 U.S.C. § 2315. Zabel and Gukeisen were sentenced to ten years imprisonment on each count to be served concurrently. They appeal and urge reversal based on (1) the government's prosecution of them under general "interstate theft" statutes rather than under 7 U.S.C. § 2024(b) which specifically proscribes unauthorized use of food stamp coupons, (2) alternatively, the district court's [1] failure to instruct the jury on 7 U.S.C. § 2024(b) as a lesser included offense, (3) the government's failure to timely produce a tape of a conversation between Gukeisen and an informant, and (4) prosecutorial misconduct. Gukeisen argues that he was entrapped as a matter of law. Zabel argues that the district court erred in admitting evidence of certain prior acts committed by him. We affirm the convictions.

## I.

Sometime between December 31, 1981, and January 3, 1982, $242,877 worth of food stamps were stolen from the Minnehaha County Food Stamp Office in Sioux Falls, South Dakota.

Shortly thereafter, Gukeisen told Ron Schmidt that he knew of a source for stolen food stamps and he was looking for buyers. Schmidt relayed this information to Virgil Larson. Larson had been cooperating with local police on drug-related matters. Schmidt had no connection at the time with law enforcement officials. Larson agreed to give Gukeisen the name and phone number of Calvin Sieg, an undercover FBI agent in Sioux City, Iowa. He gave Gukeisen that information on January 18, 1982.

The next day, Agent Sieg received a telephone call at his residence in Sioux City from a man later identified as Gukeisen. Gukeisen talked about a package worth $105,360 and that Sieg should pay $25,000 for that package. Gukeisen again called Agent Sieg the evening of January 20, 1982. The parties attempted to arrange a meeting for the exchange of food stamps for money. Gukeisen stated he had just received the food stamps that afternoon and that he would bring someone with him to Sieg's house. The next morning, Gukeisen again called Sieg and indicated that he was approximately an hour from Sioux City and that, when he reached Sioux City, he would call again for specific directions to Sieg's house. Agent Sieg received his final call from Gukeisen forty minutes later. Gukeisen put Zabel on the phone to receive directions since Zabel was more familiar with Sioux City. Sieg gave Zabel directions to his house. All phone calls between Gukeisen and Agent Sieg, except the first one, were recorded on tape.

Zabel and Gukeisen arrived at Agent Sieg's house approximately five minutes later. Gukeisen went to the door first, telling Sieg that he did not want Zabel to know about Larson's involvement. Then, Gukeisen went back to the car and returned with Zabel. Gukeisen carried in a large suitcase which belonged to Zabel's wife. In the house with Agent Sieg was an undercover agent with the South Dakota State Division of Criminal Investigation.

Sieg thereafter removed the food stamps from the suitcase and gave Gukeisen $25,000 cash in a brown paper sack. Gukeisen told Sieg that there was $100,000 worth of food stamps. Agent Sieg asked Zabel and Gukeisen if they had any more stamps. Gukeisen replied that they had gotten rid of the other half. Zabel stated they originally had $240,000 worth of food stamps which had been taken from a place which was supposed to have only $50,000 in stamps. Zabel said that someone on the inside told them about the large number and availability of the food stamps. When Sieg asked

1. The Honorable John B. Jones, Judge of the United States District Court for the District of South Dakota.

about the availability of stolen agricultural chemicals, Zabel responded that they could handle them.

After staying approximately one half hour, Zabel and Gukeisen left. As Zabel was leaving, he told Sieg to give him a call if Sieg ever needed a good safe man. Sieg gave a prearranged signal to law enforcement officials indicating that the transaction had taken place. Zabel and Gukeisen were arrested near the car in which they had arrived and which belonged to Zabel's wife. The $25,000 was found in the vehicle still in the paper sack.

A check of the food stamps revealed that they were a portion of the stamps stolen from the Minnehaha County Food Stamp Office.

## II.

Zabel and Gukeisen argue that they were denied due process and equal protection because the government prosecuted them under general "interstate theft" statutes rather than under the statute proscribing unauthorized use of food stamp coupons.

Zabel and Gukeisen were charged and convicted of violating 18 U.S.C. §§ 2314 and 2315. Section 2314 provides "Whoever transports in interstate . . . commerce any . . . securities . . . of the value of $5,000 or more, knowing the same to have been stolen . . . [s]hall be fined not more than $10,000 or imprisoned not more than ten years, or both." Section 2315 provides, "Whoever receives [or] sells . . . any . . . securities . . . of the value of $5,000 or more . . ., moving as, or which are a part of, or which constitute interstate . . . commerce, knowing the same to have been stolen . . . [s]hall be fined not more than $10,000 or imprisoned not more than ten years, or both."

The food stamp fraud statute, 7 U.S.C. § 2024(b)(1), provides:

[W]hoever knowingly uses, transfers, acquires, alters, or possesses [food stamp] coupons . . . in any manner not authoriz-

ed by [the Food Stamp Act or regulations thereunder] shall, if such coupons . . . are of a value of $100 or more, be guilty of a felony and shall, upon the first conviction thereof, be fined not more than $10,000 or imprisoned for not more than five years, or both . . . .

The defendants do not dispute that food stamps fall within the general ambit of §§ 2314 and 2315.[2] They argue, however, that Congress intended the more specific legislation of 7 U.S.C. § 2024(b)(1) to control and that, in the context of this case, § 2024(b)(1) and the interstate theft statutes require the same elements of proof.

A similar question was presented to this court in *United States v. Phillips,* 522 F.2d 388 (8th Cir.1975). The defendant in *Phillips* was charged with knowingly receiving and possessing stolen firearms in violation of a general statute governing thefts from interstate shipments. Defendant argued that he should have been charged under a provision relating specifically to stolen firearms, proscribing receipt of a firearm by a person with "reasonable cause to believe" that it was stolen. The specific offense carried a lighter penalty but required proof of a lesser mental state. This court affirmed the conviction and held "absent a congressional scheme limiting its choice of statutes, . . . the Government was free to charge Phillips under [the more general statute]." *Id.* at 393. *See also U.S. v. Librach,* 520 F.2d 550, 556 (8th Cir.1975).

The elements required to prove 18 U.S.C. §§ 2314 and 2315 differ from that of 7 U.S.C. § 2024(b)(1) in at least three respects. To establish a violation of the "interstate theft" statutes, the government must prove an interstate element not present in § 2024(b)(1). The government must also prove that the food stamps had a value of $5,000 or more, rather than $100 or more. Most important, the food stamps must have been stolen and the defendant must have known they were stolen. By contrast, § 2024(b)(1) requires only that the

---

**2.** Food stamps are "securities" under 18 U.S.C. §§ 2314 and 2315. *See* 7 U.S.C. § 2024(d); 18 U.S.C. § 8.

defendant knowingly acquire, etc., the food stamps in a manner not authorized by the Food Stamp Act.

We reject defendants' contention that § 2024(b)(1) precludes application of §§ 2314 and 2315 because § 2024(b)(1) was enacted later and is arguably more specific. The differences in the statutes suggest that Congress did not intend § 2024 to be the exclusive remedy for food stamp fraud. Nothing in the legislative history of § 2024 indicates that Congress intended to limit the government's discretion to prosecute under other applicable statutes. *See* 1964 U.S.Code Cong. & Ad.News 3275, et seq. In fact, the history indicates that Congress intended other criminal statutes to apply to food stamp fraud in addition to the violations and enforcement provision of the Food Stamp Act. *Id.* at 3292. *See also* 7 U.S.C. § 2024(d).

Gukeisen relies heavily on *Kniess v. United States,* 413 F.2d 752 (9th Cir.1969). The court in *Kniess* reversed defendant's conviction for unlawfully passing counterfeit "securities" (postal money orders) of the United States because of the existence of a more specific statute which proscribed passing forged postal money orders. The general statute outlawed passing a counterfeit "obligation or other security of the United States," defined in another section as "bills, checks, or drafts for money, drawn by or upon authorized officers of the United States." Although postal money orders were literally covered under the general "securities statute," the court held that several enactments indicated that Congress intended the specific statute to govern postal money order fraud.

In contrast to *Kniess,* elements of the respective statutes in the present case are distinguishable. Moreover, § 2024(d) expressly treats food stamp coupons as "obligations of the United States" for purposes of other criminal statutes.

■ It is true, as defendants urge, that "ambiguity concerning the ambit of criminal statutes should be resolved in favor of lenity." *United States v. Bass,* 404 U.S. 336, 347, 92 S.Ct. 515, 522, 30 L.Ed.2d 488 (1971). *See also Simpson v. United States,* 435 U.S. 6, 14–15, 98 S.Ct. 909, 913–14, 55 L.Ed.2d 70 (1978). The rule of lenity, however, has no application here because the elements required to prove the respective statutes differ so unambiguously.

■ Gukeisen and Zabel were not denied due process or equal protection by the government's prosecution under §§ 2314 and 2315.

■ Defendants were not entitled to an instruction on § 2024(b)(1) as a lesser included offense. There was no rational basis for the jury to find defendants innocent of the "interstate theft" offenses but guilty of violating the food stamp fraud statute. *United States v. Elk,* 658 F.2d 644, 648 (8th Cir.1981); *United States v. Thompson,* 492 F.2d 359, 362 (8th Cir.1974).

### III.

Zabel and Gukeisen also claim denial of due process in the government's untimely disclosure of a taped conversation between Gukeisen and Virgil Larson.

Defendants filed a Motion for Inspection and Discovery in which they requested "any and all written or recorded statements allegedly made by the Defendant(s) ... which may in any way be related to the acts charged in the indictment filed herein, including but not limited to ... any and all other recorded conversations in which the Defendant(s) had any participation." The government produced various tape recordings of conversations between Gukeisen and Sieg, the undercover FBI agent. The government, however, did not disclose the existence of the tape recording involving Gukeisen and Larson until the morning of the trial. The tape recording had been made by the South Dakota Division of Criminal Investigation and was in the state's custody until shortly before the trial. During the taped conversation, Larson gave Gukeisen Agent Sieg's name and phone number.\ The government had not planned to introduce the tape or to call Larson as a witness, and was not aware of the contents of the tape. Four days prior to trial, how-

ever, Gukeisen subpoenaed Larson to testify for the offense. As soon as the government found out that Larson would testify, it requested copies of the tape recording from the State of South Dakota.

Defense counsel moved for a continuance[3] or, in the alternative, for an order requiring immediate disclosure of the contents of the tape. The government informed the court of the circumstances and stated that copies of the tape were being made. The court denied the motion for continuance, but ordered the government to make a copy of the tape available to counsel. The government released to each defendant a copy and a transcript of the tape as soon as they were available. The defendants were allowed time to review the tape a full day before defendant Gukeisen called Larson as a witness.

Fed.R.Crim.P. 16(a)(1)(A) provides in part:

> Upon request of a defendant the government shall permit the defendant to inspect and copy or photograph: any relevant written or recorded statements made by the defendant, or copies thereof, within the possession, custody or control of the government, the existence of which is known, or by the exercise of due diligence may become known, to the attorney for the government . . . .

█ Assuming the government failed to comply with the first discovery order,[4] Rule 16 does not require a continuance or the imposition of any other sanction. *Hansen v. United States,* 393 F.2d 763, 770 (8th Cir.1968). Rule 16(d)(2) provides, "If at any time during the course of the proceedings it

is brought to the attention of the court that a party has failed to comply with this rule, the court may order such party to permit the discovery or inspection, grant a continuance, or prohibit the party from introducing evidence not disclosed, or it may enter such other order as it deems just under the circumstances." The district court ordered the government to immediately disclose the tape recording. The government did not intend to use the tape,[5] was not aware of the contents of the tape, did not have custody of the tape until it learned that Gukeisen planned to call Larson as a witness, and, when it became obvious that Larson would testify, immediately produced the tape and a copy thereof. Defendants were not prejudiced by the delayed disclosure. The tape was highly incriminating as to Gukeisen and, although Larson was a government informant at the time, did little for Gukeisen's entrapment defense. Contrary to his contentions,[6] the tape was not exculpatory as to Zabel. Moreover, defense counsel were permitted to listen to the tape and review a transcript of the tape a full day before Gukeisen called Larson to testify and the tape was introduced. We find no abuse of discretion by the district court under these circumstances.

## IV.

█ Gukeisen claims he was entrapped as a matter of law by the conduct of Virgil Larson, the government informant who gave Gukeisen the name and phone number of an undercover FBI agent who ultimately purchased the food stamps from Gukeisen.

---

3. Zabel's attorney stated, "I'm not going to move for a continuance—I guess, maybe, I would move for a continuance, but in the alternative, I would ask the Court to order that that tape be provided forthwith and, supposedly, [the government's attorney] is having a tape produced and it would be provided forthwith and we be granted a recess at least long enough to listen to the tape so that we can be prepared for it."

4. We need not decide whether the government was obligated to disclose evidence in the possession, custody, and control of the State of South Dakota.

5. The tape and transcript were introduced in the government's rebuttal of Larson's testimony.

6. Gukeisen told Larson that one of "their guys" probably would accompany him to make the exchange with Agent Sieg and that "these [guys] are all federal people. The only time these guys have served is federal time." Zabel argues that the statement was exculpatory because he had not served federal time. There was, however, no real question that Zabel accompanied Gukeisen to Agent Sieg's.

The issue turns on whether Gukeisen had the predisposition to commit the crimes with which he was charged. *United States v. French,* 683 F.2d 1189, 1191 (8th Cir. 1982). Gukeisen concedes that, prior to any government involvement, there was evidence that he knew of prospective sellers of stolen food stamps and that, "in a weak moment," he had talked to Ron Schmidt about the possibility of brokering a sale of food stamps, defined by him as "putting the buyer and seller together, but staying out of the transaction." Viewed in the light most favorable to the government, the evidence shows that Gukeisen eagerly and without hesitation arranged for and consummated the transaction with Agent Sieg. Larson's involvement merely afforded Gukeisen an opportunity to commit an offense he was predisposed to commit and did not amount to entrapment. The entrapment defense was submitted to the jury. We reject Gukeisen's contention that he was entrapped as a matter of law.

■ Gukeisen also claims that the government attorney asked him questions on cross-examination relating to drug dealings with Larson after the court specifically instructed her not to go into those matters. The trial court, however, sustained defendant's objections to the questions and the government attorney immediately moved on to other matters. We are convinced that such questions, which went unanswered, were harmless and did not affect defendant's substantial rights. Fed.R.Crim.P. 52(a); *Jennings v. United States,* 364 F.2d 513, 516 (10th Cir.1966).

We have carefully reviewed all other points of error, including Zabel's claims concerning improper closing argument and improper admission of his statements relating to other crimes, and Gukeisen's claim concerning prosecutorial misconduct in failing to disclose exculpatory evidence, and find them to be without merit.

We affirm the judgment of the district court with respect to both convictions.