**UNITED STATES of America, Appellee,**

v.

**Pete Woodrum LARD and Lloyd Dean Rigsby, Appellants.**

**Nos. 83–1801, 83–1807.**

United States Court of Appeals,
Eighth Circuit.

Submitted Jan. 11, 1984.

Decided May 15, 1984.

Rehearing En Banc Denied
July 17, 1984

Thomas E. Dittmeier, U.S. Atty., Henry J. Fredericks, Asst. U.S. Atty., St. Louis, Mo., for appellee.

Richard J. Mehan, Jr., St. Louis, Mo., for appellant Pete Woodrum Lard.

James O'Brien, St. Louis, Mo., for appellant Lloyd Dean Rigsby.

Before HEANEY, Circuit Judge, FLOYD R. GIBSON, Senior Circuit Judge, and BRIGHT, Circuit Judge.

FLOYD R. GIBSON, Senior Circuit Judge.

Appellants Pete Woodrum Lard and Lloyd Dean Rigsby were convicted on counts of conspiring to transfer (18 U.S.C. § 371) and transferring (26 U.S.C. § 5861(e)) an unregistered "firearm"—*i.e.*, "a destructive device" referred to as a pipe bomb.[1] Lard was also convicted on separate counts for making (26 U.S.C. § 5861(f)) and possessing (26 U.S.C. § 5861(d)) this destructive device. On appeal, Lard claims his conviction on all counts should be reversed because he was entrapped by an undercover government agent. Rigsby claims, as grounds for reversal, that there was insufficient evidence to support his convictions for conspiracy to transfer and transferring the destructive device. We agree with Lard's and Rigsby's claims and therefore reverse their conviction on all counts.

## I. *Facts*

Most of the relevant facts are not in dispute. On March 15, 1982, undercover Agent Anderson, of the Federal Bureau of Alcohol, Tobacco & Firearms, along with undercover Agent Koelker, of the Illinois Division of Criminal Investigation, and Joey Lindsey, a government informant, went to defendant Rigsby's house to pick him up "to go drinking." Informant Lindsey had previously introduced Rigsby to the undercover agents. While the four were on their drinking trip, undercover Agents Anderson and Koelker told Rigsby they needed guns and asked him if he knew anyone who had guns for sale. Rigsby said he knew several people who might have guns. The four then, at Rigsby's direction, went to the house of a man believed to have a rifle for sale, but the man refused to sell the rifle. Rigsby then told the agents that an acquaintance of his, named "Pete"—who was in fact defendant Pete Lard—might have some guns for sale.

---

1. Under 26 U.S.C. § 5845(a), the term "firearm" includes within its definition "a destructive device." "A destructive device," in turn, is defined by § 5845(f) as "any explosive incendiary, or poison gas (A) bomb, (B) grenade, (C) rocket having a propellant charge of more than four ounces, (D) missile having an explosive or incendiary charge of more than one-quarter ounce, (E) mine, or (F) similar device. (2) Any type of weapon by whatever name known which will, or which may be readily converted to, expel a projectile by the action of an explosive or other propellant, the barrel or barrels of which have a bore of more than one-half inch in diameter, except a shotgun or shotgun shell which the Secretary finds is generally recognized as particularly suitable for sporting purposes; and (3) any combination of parts either designed or intended for use in converting any device into a destructive device as defined in subparagraphs (1) and (2) and from which a destructive device may be readily assembled. The term "destructive device" shall not include any device which is neither designed nor redesigned for use as a weapon...."

However, Rigsby had not spoken to Lard for several months.

Agents Anderson and Koelker testified that when they arrived at defendant Lard's house, Rigsby first went in alone, stayed for eight minutes, returned to the car, and told the agents that Lard had a shotgun and detonator. According to Rigsby's and Lard's version, however, this initial meeting between Rigsby and Lard never took place. In any event, it is undisputed that Rigsby and Anderson eventually went into Lard's apartment, where Rigsby introduced Anderson to Lard. Anderson asked Lard if his shotgun was for sale, and Lard said it was not. Anderson then asked Lard if he had any other firearms for sale, and Lard replied he only had a small detonator. Lard got the detonator from his bedroom, showed it to Anderson, and offered to sell it for $100.00. After examining the detonator, Anderson said it was not powerful enough for what he had in mind and that the price was too high. Lard then showed Anderson some shotgun shells which could be taped to the detonator to produce a more powerful effect. Anderson was not impressed, again saying that $100.00 was too much money for some shotgun shells and a small detonator.

Anderson testified that, at this point of apparent impasse, Rigsby suggested that perhaps a pipe bomb would be more suitable for Anderson's purported purpose of blowing up a car. Rigsby and Lard testified, however, that Anderson was the one who brought up the idea of a pipe bomb. In any event, it is undisputed that Anderson implored Lard that he really needed a pipe bomb to accomplish his purpose. Lard then asked Agent Anderson if he could just sell him the small detonator and shotgun shells. Anderson answered that the small detonator was worth only $50.00. Lard then, after pausing for a few minutes, said he could make a pipe bomb, at a price of $100.00, and that the bomb would be ready about three hours later, at 6:00 p.m. Anderson and Rigsby then left.

Agents Anderson and Rigsby returned to Lard's apartment at 6:33 p.m. Lard showed them the pipe bomb, explaining how it could be attached to a car's radio, hot wire, engine coil, or gasoline tank. Anderson asked Lard what the bomb was made of, and Lard told him that it contained nails, some shotgun powder, some primer caps, and an electrical blasting cap. Anderson took the bomb, and headed back to the car, while Rigsby remained in the apartment long enough to ask Lard if he had any marijuana left. Rigsby emerged from the apartment a few minutes later, carrying a small plastic bag of marijuana which, according to Anderson, Rigsby claimed to have received "for his troubles." Rigsby testified that the bag contained "only seeds" and that he, the two agents, and Lard had smoked all of the "grass" while they were in Lard's apartment. The agents did not dispute this and the marijuana bag was never introduced at trial, nor was its value adduced.

On March 16, 1982, the pipe bomb was detonated by BAFT agents, who concluded that the bomb was a "destructive device" as that term is defined by 26 U.S.C. § 5845(f). *See supra* note 1. Defendants Lard and Rigsby were then arrested.

## II. *Lard's Entrapment Defense*

Lard contends that his convictions for conspiring to transfer, transferring, making, and possessing a destructive device-type firearm—*i.e.*, the pipe bomb—should be reversed because he was entrapped by Agent Anderson.

The entrapment defense is based on the assumption that Congress did not intend to punish a defendant who has committed all the elements of a proscribed offense upon the inducement or instigation of government agents. *United States v. Russell*, 411 U.S. 423, 435, 93 S.Ct. 1637, 1644, 36 L.Ed.2d 366 (1973); *Sherman v. United States*, 356 U.S. 369, 372, 78 S.Ct. 819, 820, 2 L.Ed.2d 848 (1958); *Sorrells v. United States*, 287 U.S. 435, 441, 452, 53 S.Ct. 210, 212, 216, 77 L.Ed. 413 (1932). As Mr. Justice Brandeis put it, "the Government may set decoys to entrap criminals. But it may not provoke or create a crime and then punish the criminal, its creature." *Casey*

*v. United States*, 276 U.S. 413, 423, 48 S.Ct. 373, 376, 72 L.Ed. 632 (1928) (dissenting opinion). Thus, although the Supreme Court has sharply divided on the proper standard for applying the entrapment defense, it is generally agreed that "[t]he conduct with which the defense of entrapment is concerned is the *manufacturing* of crime by law enforcement officials and their agents." *Lopez v. United States*, 373 U.S. 427, 434, 83 S.Ct. 1381, 1385, 10 L.Ed.2d 462 (1963); *Russell*, 411 U.S. at 439, 93 S.Ct. at 1646 (Mr. Justice Stewart, dissenting). This basic underlying principle was reaffirmed in *Sherman*, 356 U.S. at 372, 78 S.Ct. at 820 (1958), where Chief Justice Warren stated, for the majority: "The function of law enforcement is the prevention of crime and the apprehension of criminal. Manifestly, that function does not include the manufacturing of crime."

■ However, the entrapment defense has no application where the government agents merely use stealth, strategy, or deception to trap an "unwary criminal" or merely provide the defendant with an opportunity or facility to commit the crime. *Sherman*, 356 U.S. at 372, 78 S.Ct. at 821; *Sorrells*, 287 U.S. at 441, 53 S.Ct. at 212. Rather, "[i]t is only when the Government deception actually implants the criminal design in the mind of the defendant that the defense or entrapment comes into play." *United States v. Russell*, 411 U.S. 432, 436, 93 S.Ct. 1643, 1645 (1973); *Hampton v. United States*, 425 U.S. 484, 489, 96 S.Ct. 1646, 1649, 48 L.Ed.2d 113 (1976); *Sorrells*, 287 U.S. at 442, 53 S.Ct. at 212. As the court stated in *Sherman:* "Entrapment occurs only when the criminal conduct was 'the product of the *creative* activity' of law enforcement officials .... To determine whether entrapment has been established, a line must be drawn between the trap for the unwary innocent and the trap for the unwary criminal." *Id.*, 356 U.S. at 372, 78 S.Ct. at 821, *quoting Sorrells*, 287 U.S. at 441, 451, 53 S.Ct. at 212, 216.

In *United States v. Shaw*, 570 F.2d 770, 772 (8th Cir.1978), the court, following the teachings of the Supreme Court, held that for a defendant to establish entrapment as a matter of law:

> The evidence must clearly have indicated that a government agent originated the criminal design; that the agent implanted in the mind of an innocent person the disposition to commit the offense; and that the defendant then committed the criminal act at the urging of the government agent.

■ The key question is therefore whether the government agent caused or induced the defendant to commit a crime he was not otherwise predisposed—*i.e.*, willing and ready—to commit whenever a propitious opportunity arose. *See United States v. Jannotti*, 673 F.2d 578, 597, 604 (3rd Cir.1982) (en banc); *United States v. Borum*, 584 F.2d 424, 427 (D.C.Cir.1978); *United States v. Bradsby*, 628 F.2d 901, 903 (5th Cir.1980). As the Supreme Court has indicated, the principal focus of this inquiry is upon the "intent or predisposition of the defendant to commit the crime." *United States v. Russell*, 411 U.S. at 429, 93 S.Ct. at 1641; *Hampton v. United States*, 425 U.S. at 488, 96 S.Ct. at 1649.

■ Determining a defendant's predisposition requires examination of the defendant's personal background to see "where he sits on the continuum between the naive first offender and the streetwise habitue." *United States v. Townsend*, 555 F.2d 152, 155 n. 3 (7th Cir.), *cert. denied*, 434 U.S. 897, 98 S.Ct. 277, 54 L.Ed.2d 184 (1977). It also requires considering the extent to which the government agent has endeavored to instigate, importune, or induce the commission of the criminal act. *Id.; United States v. Borum*, 584 F.2d at 427; *United States v. Watson*, 489 F.2d 504, 511 (3rd Cir.1973). For instance, in *Sherman* the Supreme Court held that a defendant was entrapped, as a matter of law, where he did not readily commit the criminal offense (the sale of narcotics) upon the government's initial suggestion or solicitation, but reluctantly did so only after being further solicited or beguiled by the government agent. *Id.*, 356 U.S. 373–74, 78 S.Ct. 821. *See also United States v. Sorrells*, 287

U.S. 441–42, 53 S.Ct. 212. Various courts making the predisposition determination have similarly noted the important distinction between a defendant who eagerly commits a crime upon mere government suggestion, and one who reluctantly does so after further solicitation. *See United States v. Reynoso-Ulloa*, 548 F.2d 1329, 1336 (9th Cir.1977), *cert. denied*, 436 U.S. 926, 98 S.Ct. 2820 (1978) ("The most important [predisposition] factor, as revealed by Supreme Court and other decisions, is whether the defendant evidenced reluctance to engage in criminal activity which was overcome by repeated Government inducement."); *accord United States v. Jannotti*, 673 F.2d 578, 604 (3rd Cir.1982); *United States v. Borum*, 584 F.2d 424, 428–29 (D.C.Cir.1978); *United States v. French*, 683 F.2d 1189, 1193 (8th Cir.), *cert. denied*, 459 U.S. 972, 103 S.Ct. 304, 74 L.Ed.2d 284 (1982).

■ Viewing the evidence in a light most favorable to the government,[2] we conclude that the evidence showed Lard's entrapment as a matter of law; no reasonable juror could have found beyond a reasonable doubt that Lard was ready and willing to commit the crimes and that the agents did no more than afford him an opportunity to do so.[3]

The record indicates that before Anderson met Lard, the latter had not engaged in any prior criminal conduct and had no record of making or dealing in any firearms—let alone pipe bombs or similar such "destructive-device" firearms. Rigsby directed Agent Anderson to Lard as a possible source of a shotgun, not a pipe bomb. After Lard refused to sell his shotgun, the discussion between Anderson and Lard turned to the possible sale of some shotgun shells and a small detonator. However, as the government apparently concedes, Lard's possession of and attempt to sell these items were neither unlawful nor had any bearing on the criminal charges against him, which concerned only the pipe bomb—*i.e.*, the "destructive device." [4] The subject of the pipe bomb was raised only after Anderson, in an attempt to bait Lard, repeatedly implored that he needed something much more powerful than the small detonator and shotgun shells to achieve his purpose of blowing up a car. Although, according to Anderson, Rigsby first suggested that a pipe bomb might be more suitable to Anderson's purpose, Anderson was the first to embrace this suggestion and the first to give criminal content to it by soliciting Lard to make and sell him a pipe bomb for money. But Lard initially resisted this solicitation, asking Anderson if he could just sell him the small detonator and shotgun shells instead of a pipe bomb. The sale of the detonator and shotgun shells would not have been unlawful. *See supra* note 4. After Agent Anderson rebuffed Lard's legal counteroffering, saying the detonator was too small, Lard contemplated Anderson's request for a few moments, and then finally agreed to make and sell the pipe bomb for the price of $100.00.

Given Lard's lack of prior criminal record or dealings in unregistered firearms, his failure to suggest a pipe bomb in response to Anderson's repeated baiting, and his initially expressed reluctance to accept Anderson's solicitation and inducement to commit crimes, we conclude that he was not predisposed to commit the crimes charged but did

---

**2.** "In determining whether there was a jury issue on the question of entrapment, we must review the evidence in the light most favorable to the government." *French*, 683 F.2d at 1192.

**3.** The prosecution has the burden to prove a defendant's predisposition beyond a reasoanble doubt. *See French*, 683 F.2d at 1191 n. 1; *see also United States v. Jannotti*, 673 F.2d at 597.

**4.** A shotgun and a shotgun shell are expressly excluded from the definition of the term "destructive device" in 26 U.S.C. § 5845(f). Further, there is no suggestion that Lard's shotgun was even a "firearm" as that term is defined by § 5845(a); and, the shotgun shells were clearly not a firearm. Moreover, the government has neither suggested nor attempted to establish that the small detonator Lard possessed was a "destructive device" as that term is defined by § 5845(f). Nor has the government attempted to establish that the combination of the shotgun shells and the detonator constituted a "destructive device" under § 5845(f). *See United States v. Curtis*, 520 F.2d 1300, 1302–03 (1st Cir.1975).

so only upon the instigation and inducement of Agent Anderson. *See United States v. Borum*, 584 F.2d 424, 429 (D.C. Cir.1978). While law enforcement officials may use strategy, stealth, and even deception to catch the "unwary criminal," they may not arbitrarily select an otherwise law abiding person, gain his confidence, and then proceed to beguile or lure him to commit a crime he would not have otherwise attempted. It is the government's duty to prevent crime, not to instigate or create it.

We believe the evidence of entrapment here compares favorably with the evidence found sufficient to establish entrapment as a matter of law in *Sherman*. In *Sherman*, 356 U.S. 371, 373–74, 78 S.Ct. 821, the defendant was convicted for selling narcotics to a government paid informant. The defendant, who had an extensive record of selling narcotics, was approached by the government informant at a time when the defendant was being treated for narcotics addiction. The government informant gained the confidence of the defendant, and, despite some initial reluctance, the defendant capitulated to the informant's repeated requests to supply him with narcotics. The Court held the defendant was not predisposed and that there was entrapment as a matter of law. *Id.* at 373–74, 78 S.Ct. 821.

Lard, like the defendant in *Sherman*, expressed initial reluctance to engage in criminal wrongdoing. Concededly, this case is somewhat different from *Sherman* in that Lard may have expressed less reluctance than did the defendant in *Sherman;* but this is a difference of degree, not kind. Moreover, this difference must be balanced against the fact that the defendant in *Sherman* had an extensive record of narcotics trafficking—which would suggest predisposition—while Lard had absolutely no prior record of dealing in unregistered firearms. Weighing both the personal background and the reluctance factors, we believe on this record the showing of Lard's lack of predisposition was comparable in strength to that showing made in *Sherman*.

The government seeks to overcome the entrapment defense by urging that since Rigsby first brought up the idea of the pipe bomb, Agent Anderson could not have originated the criminal design and implanted it in Lard's mind. This argument is unavailing for two reasons. First, Rigsby's suggestion was made only after Anderson repeatedly implored that he needed something more powerful than a detonator, no doubt attempting to entice Lard to offer a destructive device. Hence, Anderson served as the catalyst behind Rigsby's suggestion; and Rigsby merely served as Anderson's unwitting agent. Second, Anderson was undisputably the first to embrace "Rigsby's suggestion," and the first to give it criminal significance by soliciting Lard to sell him a pipe bomb. Thus, Anderson, not Rigsby, was the one who implanted the criminal design in Lard's mind by soliciting him and offering him an inducement. Had Anderson not immediately followed through on Rigsby's suggestion, Lard would not have committed any criminal wrongdoing.

The government additionally urges that Lard's predisposition was evidenced by his possession of the necessary ingredients to make the pipe bomb and by his "impressive" ability to produce the bomb in a matter of hours, apparently without help or directions. This argument is based upon sheer factual speculation. There was no evidence that Lard had the necessary pipe bomb making ingredients in his apartment when he accepted Anderson's offer. All we know is that Lard had a detonator and shotgun shells. Second, the government's own expert testified that making a pipe bomb was "very easy," and did not require any special expertise or knowledge. The expert also testified that he could have constructed the pipe bomb in ten minutes, far short of the three hours Lard apparently needed to assemble this device. Therefore, the surrounding circumstances do not support the government's implication that Lard had developed an expertise in making pipe bombs, had the necessary ingredients readily available, and eagerly awaited a

propitious opportunity to ply his trade for financial gain.

The government finally points to numerous Eighth Circuit cases holding that no entrapment occurs where the government agents merely request to purchase contraband or illegal merchandise from an unwary criminal. *See United States v. Zabel,* 702 F.2d 704, 710 (8th Cir.1983); *United States v. French,* 683 F.2d 1189, 1193 (8th Cir.), *cert. denied,* 459 U.S. 972, 103 S.Ct. 304, 74 L.Ed.2d 284 (1982); *United States v. Shaw,* 570 F.2d 770, 772 (8th Cir.1978); *Kibby v. United States,* 372 F.2d 598, 602–03 (8th Cir.), *cert. denied,* 387 U.S. 931, 87 S.Ct. 2055, 18 L.Ed.2d 993 (1967). These cases stand for the well-recognized proposition, first enunciated in *Sorrells,* 287 U.S. at 441, 53 S.Ct. at 212, that no entrapment occurs where the agent merely affords the defendant with the opportunity or facility to commit a crime. As mentioned above, however, Agent Anderson went beyond merely providing Lard with the opportunity to commit a crime; he ensnared Lard by implanting in him a law-breaking disposition that was not theretofore present. Moreover, unlike here, in each of the above cited Eighth Circuit cases, the defendant's predisposition was evinced by his prior criminal activity or by his quick and eager response to the government's initial solicitation.

We recognize that the entrapment defense is a "relatively limited defense" and does not give the federal judiciary a "chancellor's foot" veto over those law enforcement practices of which it may not completely agree. *Russell,* 411 U.S. at 435, 93 S.Ct. at 1644. *Hampton,* 425 U.S. at 490, 96 S.Ct. at 1650. We also recognize that infiltration of criminal operations by undercover agents is an accepted and necessary practice, particularly in combating an ever-expanding narcotics traffic. *See Hampton,* 425 U.S. at 495–96 n. 6, 96 S.Ct. at 1652–53 (J. Powell, concurring); *See also*

*Jannotti,* 673 F.2d 578 (undercover operations—including inducements—needed to discover and expose corruptible public officials). However, the line must be drawn where, as here, a government agent lures the unwary innocent and then implants a law-breaking disposition that was not theretofore present. In such cases, the government takes on the unwholesome appearance of the consummate manufacturer of crime. The continuing vitality and integrity of our "government of laws" would be imperiled if we sanctioned the manufacturing of crime by those responsible for upholding and enforcing the law. As Mr. Justice Frankfurter stated in *Sherman,* 356 U.S. at 384, 78 S.Ct. at 826: "The power of government is abused and directed to an end for which it was not constituted when employed to promote rather than detect crime and to bring about the downfall of those who, left to themselves, might well have obeyed the law. Human nature is weak enough and sufficiently beset by temptations without government adding to them and generating crime."

Mr. Justice Frankfurter's piercing assessment seems particularly applicable to this case because the government here was creating a crime, not investigating a crime or responding to a situation that threatened the public peace. Finite government resources should be used to ferret out crime rather than promote additional criminal activity, not previously planned, considered, or readily agreed to by unsuspecting and unwary individuals.

■ Finally, we should add that, apart from the entrapment defense, Agent Anderson's overinvolvement in conceiving and contriving the crimes here approached being "so outrageous that due process principles should bar the government from invoking judicial processes to obtain a conviction." *See United States v. Russell,* 411 U.S. at 431–32, 93 S.Ct. at 1642–43.[5] *See*

---

5. In *Hampton v. United States,* 425 U.S. 484, 96 S.Ct. 1646, 48 L.Ed.2d 113, the plurality opinion, written by Justice Rehnquist for three justices, held that once predisposition had been shown, government misconduct could never be used to

overturn a conviction, not even on due process grounds. *Id.* at 490, 96 S.Ct. at 1650. However, five justices disagreed with the view that the concept of fundamental fairness inherent in the guarantees of due process would never prevent

*also United States v. Twigg*, 588 F.2d 373, 379 (3rd Cir.1978); *United States v. McCaghren*, 666 F.2d 1227, 1230–31 (8th Cir. 1981). Anderson's conduct was not aimed at facilitating discovery or suppression of ongoing illicit dealings in unregistered firearms. Rather, it was aimed at creating new crimes for the sake of bringing criminal charges against Lard, who, before being induced, was lawfully and peacefully minding his own affairs. *See United States v. Twigg*, 588 F.2d at 381. The government agents' overzealous efforts to instigate crime also involved rather extreme and questionable measures—including the smoking of marijuana—to gain Lard's confidence and lure him into committing a crime he was not otherwise ready and willing to commit. Concepts of fundamental fairness preclude us from putting our imprimatur on law enforcement overreaching conduct designed to instigate "a criminal act by persons 'otherwise innocent in order to lure them to its commission and to punish them.'" *Russell*, 411 U.S. at 428–29, 93 S.Ct. at 1641, *quoting Sorrells v. United States*, 287 U.S. at 448, 53 S.Ct. at 215.

## III. *Rigsby's Conspiracy Count*

Rigsby claims there was insufficient evidence to sustain his conviction for conspiring with Lard to transfer a destructive device. As a corollary to this, Rigsby also urges that Lard's various hearsay statements—that he had a detonator for sale and that he would produce the pipe bomb—were improperly admitted under the Rule 801(d)(2)(E)'s "coconspirator exception" because the government failed to prove: (1) a conspiracy to transfer the pipe bombs existed; (2) Rigsby and Lard (the hearsay declarant) were part of that conspiracy; and (3) that the declaration was made during the course of and in furtherance of the

conspiracy. *See United States v. Bell*, 573 F.2d 1040, 1043 (8th Cir.1978).

■ Even considering the hearsay statements of Lard, there was insufficient evidence to support Rigsby's conviction for conspiring to transfer the pipe bomb in question; at best there was some evidence showing an agreement to transfer a shotgun and a detonator, but Rigsby was not and could not have been criminally charged for entering into such an agreement.[6] The undisputed evidence indicates that when Rigsby first went into Lard's apartment, Rigsby was operating under the assumption that Agents Anderson and Koelker wanted to purchase a gun, not a pipe bomb. In fact, the visit to Lard's apartment was prompted by Anderson's request for guns and Rigsby's response that Lard might have a shotgun available, though Rigsby had not spoken to Lard for several months. Despite the government's suggestion, nothing about the initial eight-minute meeting between Lard and Rigsby indicates that the two were involved in a conspiracy to transfer a pipe bomb. Rigsby emerged from that meeting saying only that Lard had a shotgun and a detonator; no mention was made of a pipe bomb. Nor did Rigsby's suggestion that a pipe bomb would be suitable for Anderson's purpose demonstrate a criminal conspiracy. That suggestion was a spontaneous response to Anderson's repeated entreaties that he needed something more powerful than the small detonator and shotgun shells offered by Lard. Agent Anderson himself admitted that no one had previously mentioned a pipe bomb. Moreover, Anderson was the one who immediately embraced the suggestion and began soliciting Lard, who, as mentioned above, expressed initial reluctance to making and selling the pipe bomb. Rigsby had no part in the subsequent discussions between Anderson and Lard regarding the

the conviction of a predisposed defendant, regardless of the outrageousness of police behavior in light of the surrounding circumstances. *Id.* at 492, 96 S.Ct. at 1651, & n. 2 (Powell J., concurring, joined by Blackmun J.); *Id.* at 497, 96 S.Ct. at 1653 (Brennan J., dissenting, joined by Stewart J., and Marshall J.).

**6.** Because Lard's shotgun and detonator were not "destructive devices" or "firearms" under 26 U.S.C. § 5845 (*see supra* note 4), Rigsby could not be criminally charged with "conspiring" to transfer such items.

sale of the pipe bomb. Finally, the small bag of marijuana seeds that Agent Anderson claimed Rigsby had received from Lard was not introduced into evidence, and no testimony of its worth was adduced. In sum, there was insufficient evidence demonstrating the essential agreement, either express or informal, between Lard and Rigsby to transfer the pipe bomb in question. As such, the conspiracy count must be reversed. *See Iannelli v. United States,* 420 U.S. 770, 777, 95 S.Ct. 1284, 1289, 43 L.Ed.2d 616 (1975).

### IV. *Rigsby's Conviction for Transferring a Destructive Device*

 The evidence was similarly insufficient to support Rigsby's conviction for transferring the pipe bomb in question. As the district court instructed, a defendant who willfully causes, aids, abets, counsels, induces, or procures the commission of an act against the United States—in this case transferring an unregistered destructive device—is punishable as a principal. *See* 18 U.S.C. § 2; *Pereira v. United States,* 347 U.S. 1, 8–9, 74 S.Ct. 358, 362–3, 98 L.Ed. 435 (1954); *United States v. Burkhalter,* 583 F.2d 389, 391 (8th Cir.1978) (18 U.S.C. § 2 applies to Firearms Act). "An aider and abettor need not know every last detail of the substantive offense ..., but he must share in the principal's essential criminal intent." *United States v. Sanborn,* 563 F.2d 488, 491 (1st Cir.1977) (citation omitted); *Johnson v. United States,* 195 F.2d 673, 675–76 (8th Cir.1952). In the case of a destructive device-firearm transfer, the aider and abettor would have to knowingly participate in the transfer. *Burkhalter,* 583 F.2d at 392. Also, the aider and abettor must "in some sort associate himself with the venture, that he participate in it as something he wishes to bring about, that he seek by his action to make it succeed." *Nye & Nissen v. United States,* 336 U.S. 613, 619, 69 S.Ct. 766, 770, 93 L.Ed. 919 (1949), *quoting United States v. Peoni,* 100 F.2d 401, 402 (2d Cir.1938) (J., Hand). Mere presence at the scene of the crime or mere association with one engaged in a crime does not make him an

aider and abettor. *Johnson,* 195 F.2d 675–76; *United States v. Archer,* 450 F.2d 1106, 1108 (8th Cir.1977).

 Viewing the evidence in a light most favorable to the government, there was insufficient proof supporting a jury finding that Rigsby was guilty beyond a reasonable doubt of aiding and abetting Lard's transfer of the pipe bomb. Although Rigsby set up the meeting between Lard and Anderson, he did so only to facilitate the sale of a shotgun or perhaps a detonator, not a destructive device firearm such as a pipe bomb. As mentioned above, his suggestion of a pipe bomb was spontaneously made in response to Anderson's repeated pleas that he needed something more powerful; and Rigsby had nothing to do with the subsequent negotiations between Anderson and Lard regarding the pipe bomb. Although Rigsby returned with Anderson to Lard's residence, he took no part in the actual transfer of the bomb from Lard to Anderson; in fact, no testimony indicated that Rigsby said anything to Lard after the latter agreed to make the pipe bomb. Under the circumstances, Rigsby's mere presence at the scene of the crime did not make him an aider and abettor. *See Johnson,* 195 F.2d at 675–76.

Judgments reversed.