# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 98-2468EM

_____

| | | |
|---|---|---|
| United States of America, | * | |
| | * | |
| Appellee, | * | |
| | * | On Appeal from the United |
| v. | * | States District Court |
| | * | for the Eastern District |
| | * | of Missouri. |
| Delaine F. Berg, | * | |
| | * | |
| Appellant. | * | |

_____

Submitted:  January 12, 1999

Filed:  May 27, 1999

_____

Before RICHARD S. ARNOLD, BRIGHT, and WOLLMAN,[1] Circuit Judges.

_____

RICHARD S. ARNOLD, Circuit Judge.

A jury convicted Delaine Berg of conspiracy to manufacture methamphetamine in violation of 21 U.S.C. § 846.  Berg received a 30-year (360-month) prison sentence to be followed by a five-year term of supervised release.  Berg appeals the conviction and sentence, raising a number of issues.  He argues that outrageous government conduct led to a violation of his right to due process.  He also raises a similar but

_____

[1]The Hon. Roger L. Wollman became Chief Judge of this Court on April 24, 1999.

distinct entrapment argument; argues that his conviction should be set aside because the District Court refused to declare a witness as hostile; and, finally, makes a sentencing entrapment argument. We do not agree with Berg's arguments, and find no fault in the District Court's[2] decisions. We therefore affirm both the conviction and the sentence.

I.

The events leading up to Berg's conviction began with the arrest of Billy Hart and Richard Kearbey. On July 29, 1996, Hart and Kearbey were arrested in Arizona while attempting to buy methamphetamine (Trial Tr. 4, 46, 111, 144). Hart and Kearbey both agreed to cooperate with the government (Trial Tr. 4, 111-12). In exchange for Hart's and Kearbey's cooperation, the government agreed to ask for reduced sentences for both Hart and Kearbey on the Arizona methamphetamine charge (Trial Tr. 4, 112). Hart and Kearbey then met with Herman Hogue, a Drug Enforcement Administration agent in southeastern Missouri (Trial Tr. 4, 113). Hogue learned that Hart knew John Clayton (Trial Tr. 196). Hogue was interested in Clayton, and Hart knew Clayton was involved in trafficking methamphetamine (Trial Tr. 113). Under Hogue's direction, Hart contacted Clayton to try to arrange a controlled buy of methamphetamine (Trial Tr. 196).

Hart and Kearbey first met with Clayton on August 29, 1996, at Clayton's home, and then again on September 5 and September 10 (Trial Tr. 5, 7, 114, 115). On September 5, Clayton sold Hart and Kearbey an ounce of methamphetamine and fronted them another ounce (Trial Tr. 7). On September 10, Hart and Kearbey paid for the ounce Clayton fronted them on September 5 (Trial Tr. 7). Clayton also fronted them a second ounce. Id. Hart testified that during the meeting on August 29, Clayton

---

[2]The Hon. E. Richard Webber, United States District Judge for the Eastern District of Missouri.

"showed interest in doing a meth cook" (Trial Tr. 114). It is not clear, however, who initially suggested manufacturing the methamphetamine. Kearbey testified that Clayton suggested manufacturing methamphetamine (Trial Tr. 15). Clayton, on the other hand, testified that the idea originated with Hart and Kearbey (Trial Tr. 398-401). Hart testified that at the meeting on September 10, Clayton indicated he knew someone who could cook the methamphetamine (Trial Tr. 116). Hart and Kearbey met with Clayton again on September 16 and September 24 (Trial Tr. 8, 10, 116-17). Delaine Berg, the defendant, was also present at the September 24 meeting, and, according to Hart, the four of them discussed doing "a large cook where everyone would make a lot of money" (Trial Tr. 117). Although Hart and Kearbey met Berg for the first time on September 24, Hart testified that he believed Clayton had already talked to Berg about cooking methamphetamine (Trial Tr. 117).

The meeting on September 24 was tape recorded by Kearbey (Trial Tr. 11). During the meeting Kearbey and Berg discussed the amount of methamphetamine to be cooked, as well as what Berg had cooked in the past:

| Kearbey: | ". . . Have you been making any quantities or just small?" |
| Berg: | ". . . I make quarter pounds or something like that." |
| Kearbey: | "That's why I like this, this . . ." |
| Berg: | "You take as much risk." |
| Kearbey: | "Oh, yeah." |
| Berg: | "and as much trouble doing that as what if you make, you know, ten, twelve pounds. I mean I'd rather do it that way." |

Kearbey:            "Well that's what we figured out and it's. You know, we would rather do the bigger deal. It's the same damn risk."

Berg:               "Um huh."

(Government Ex. 2, p. 14.)  On October 7, Clayton gave Hart a list of ingredients needed to manufacture the methamphetamine, telling them that the list came from Berg (Trial Tr. 18, 127-28).  Hart and Kearbey obtained the items on the list (Trial Tr. 23). They supplied the flasks and glassware necessary to manufacture the methamphetamine and the location where the manufacturing would occur (Trial Tr. 22, 174-75).  They also helped Clayton soak down pills, supplied by Clayton, for the ephedrine necessary to manufacture the methamphetamine (Trial Tr. 21-22).

Kearbey testified that on October 15, Clayton brought Berg to Kearbey's house (Trial Tr. 24).  Hart, Kearbey, and Berg then went to the location secured by Kearbey to manufacture the methamphetamine (Trial Tr. 24-25, 130).  According to Hogue's testimony, Hart and Kearbey notified Hogue that the cooking had started  (Trial Tr. 206).  Hogue obtained a search warrant and, on October 16, during the manufacturing process, Berg was arrested (Trial Tr. 207-08).  Berg was subsequently indicted, tried, and found guilty of conspiracy to manufacture methamphetamine.  Clayton pleaded guilty to the charge and was called as a witness by the defense.  Berg now appeals his conviction, raising four separate issues.  We will address each of those issues, but do not find that any of them warrants a reversal of Berg's conviction or a reduction in his sentence.

II.

Berg first argues that the government's extremely outrageous conduct led to a violation of his Fifth Amendment right to due process.  The outrageous-conduct

-4-

argument often arises in cases where the government has been involved in sting or reverse-sting operations. See United States v. Cannon, 88 F.3d 1495, 1506 (8th Cir. 1996). The defense of outrageous conduct "focuses on the government's conduct." Id. (citing United States v. Kummer, 15 F.3d 1455, 1459 n.9 (8th Cir. 1994)). This defense is distinct from entrapment, which focuses on the defendant's predisposition to commit a crime, and which also often arises in cases involving a sting or reverse-sting operation. See id.

Participation by government agents or informants in the illegal manufacture or distribution of drugs is a recognized means for the government to obtain convictions in drug-related offenses. See United States v. Russell, 411 U.S. 423, 432 (1973). When government agents or informants "go too far in manufacturing a crime and inducing a defendant into it," however, their conduct may violate the defendant's right to due process. Gunderson v. Schlueter, 904 F.2d 407, 410 (8th Cir. 1990) (citing Russell, 411 U.S. at 431-32). The Supreme Court has recognized that "some day" a case might arise where the government's conduct is "so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction." Russell, 411 U.S. at 431-32. The Supreme Court has yet to see that day.

This Court has stated that "[t]he level of 'outrageousness' needed to prove such a due process violation . . . is quite high." Gunderson, 904 F.2d at 410. And, like the Supreme Court, this Court has yet to see a case in which the government's conduct rose to the level of such outrageousness. We have said that the government agent's involvement "approached" a level of outrageousness that would bar a conviction, but that is as close as we have come. United States v. Lard, 734 F.2d 1290, 1296 (8th Cir. 1984). See also Gunderson, 904 F.2d at 411. The government agent in Lard went to the defendant's house to see if he had any firearms for sale and, after rejecting the only thing the defendant had to offer (a detonator), asked the defendant to make a pipe bomb. Lard, 734 F.2d at 1292. The defendant had no prior criminal record and had

never dealt in firearms or destructive devices. Id. at 1294. We found that the defendant had been entrapped as a matter of law. Id. We did not find, however, a violation of the defendant's due-process rights. Id. at 1297.

In support of his argument, Berg cites a Third Circuit case in which a panel of the court found outrageous conduct by the government. The defendants in that case were also convicted of charges resulting from the illegal manufacture of methamphetamine. See United States v. Twigg, 588 F.2d 373, 374 (3rd Cir. 1978). The Third Circuit has declined to follow Twigg, and its position has been called into doubt. See, e.g., United States v. Beverly, 723 F.2d 11, 12 (3rd Cir. 1983); United States v. LBS Bank -- New York, Inc., 757 F. Supp. 496, 499 n.3 (E.D. Pa. 1990). Moreover, the facts in Twigg are different from those in the present case. The government informant in Twigg played an active role in the entire operation. He contacted one of the defendants to discuss setting up a methamphetamine laboratory and was completely in charge of the manufacturing process. See Twigg, 588 F.2d at 375-76. Production assistance from the two defendants was provided only at the informant's direction. Id. at 376. In this case, Hart and Kearbey played a less substantial role in the events leading up to Berg's, and Clayton's, arrest. They initially met with Clayton only to see if they could purchase methamphetamine from him (Trial Tr. 196). Additionally, Kearbey's and Clayton's testimony differs as to who originated the idea to manufacture methamphetamine (Trial Tr. 15, 401). Berg himself preferred to make a large quantity. The government's conduct in this case does not reach the same level as that in Twigg.

We recognize that the line between "covert investigative conduct . . . that is within constitutional bounds" and conduct that is so outrageous as to shock the conscience of the court may sometimes be hard to draw. Cannon, 88 F.3d at 1506. The conduct of the government in this case, however, was not so outrageous as to violate Berg's constitutional rights. We therefore deny Berg's request to set aside his conviction on these grounds.

## III.

Berg's second argument is about entrapment. He argues that the District Court erred by refusing to instruct the jury on the entrapment defense. Unlike the defense of outrageous conduct, which focuses on the government's conduct, the entrapment defense focuses on the defendant's predisposition to commit the crime in question. Cannon, 88 F. 3d at 1506. The defendant must show that the government induced the defendant to commit the crime. See id. at 1504. The prosecution then has the burden to prove that "the defendant was predisposed to commit the crime, apart from the government's inducement." Id. at 1504 (citing Jacobson v. United States, 503 U.S. 540, 553-54 (1992)). If the defendant exhibits any predisposition to engage in the criminal conduct, the district court need not instruct the jury on entrapment. See United States v. Neal, 990 F.2d 355, 358 (8th Cir. 1993). "[I]f predisposition exists, then there is not sufficient evidence from which a reasonable jury could find entrapment." Id. (citations omitted).

Berg first met with Hart and Kearbey on September 24 (Trial Tr. 9, 117). Before that meeting, Berg and Clayton (who was not working with the government) privately discussed working with Hart and Kearbey to manufacture methamphetamine (Trial Tr. 117-18). Although Berg's prior experience with manufacturing methamphetamine may have involved only small amounts of the drug, Berg readily agreed to manufacture the larger, twelve-pound amount (Government Ex. 2, p. 14). He indicated, in fact, that he'd "rather do it that way." Id. Berg has not shown that he was induced by the government, through its informants, to commit the crime.

Even were we to agree with Berg that he was induced to manufacture methamphetamine, Berg did have a predisposition to commit the crime. His never having "cooked" such a large batch need not necessarily mean he was not predisposed to do so. "Predisposition . . . focuses upon whether the defendant was an 'unwary innocent' or, instead, an 'unwary criminal' who readily availed himself of the

opportunity to perpetrate the crime." <u>Mathews v. United States</u>, 485 U.S. 58, 63 (1988) (citations omitted). Berg had specialized knowledge in manufacturing methamphetamine. We do not believe Berg was an "unwary innocent" in this case. When the defendant has a predisposition to commit the crime for which he is charged, he cannot successfully argue that he was entrapped. The District Court, therefore, did not have to instruct the jury on entrapment.

IV.

Berg also argues that his conviction should be set aside because the District Court limited his examination of John Clayton. Prior to Berg's trial, Clayton pleaded guilty to conspiracy to manufacture methamphetamine in exchange for the prosecution's agreement to tell the Court that he had cooperated (Trial Tr. 421-23). The prosecution did not call Clayton as a witness during Berg's trial. Berg, however, did. During re-direct examination, Berg sought to examine Clayton as a hostile witness, and to be allowed to ask Clayton leading questions. The Court refused Berg's request (Trial Tr. 447-48). Although Berg may have had difficulty seeking some of the information he wanted from Clayton, the record does not indicate that Clayton was a hostile witness. Berg argues that the Court's refusal to declare Clayton a hostile witness led to a violation of his right to confront a witness against him. We find no merit in this argument. The decision to declare a witness hostile is generally within the discretion of the trial court and the Court did not abuse that discretion in this case. Berg was allowed to examine Clayton fully. We do not know what additional information Berg could have gotten out of Clayton if leading questions had been allowed.

V.

Finally, Berg makes a sentencing-entrapment argument. We have recognized that sentencing entrapment can occur. See <u>United States v. Lenfesty</u>, 923 F.2d 1295, 1300 (8th Cir. 1991). Sentencing entrapment occurs when official conduct leads a

defendant predisposed to deal only in small quantities of drugs to deal in larger quantities, leading to an increased sentence. See United States v. Barth, 990 F.2d 422, 424 (8th Cir. 1993). Most of our previous cases involving sentencing-entrapment arguments involved defendants who sold drugs to informants or undercover agents. See, e.g., Barth, 990 F.2d at 423; Lenfesty, 923 F.2d at 1295. In all of those cases the Court declined to find sentencing entrapment, and no downward departure in sentencing was permitted.

Berg argues that Hart and Kearbey induced him to participate in a crime he was not otherwise predisposed to commit. Berg admits that he had manufactured methamphetamine prior to working with Clayton, Hart, and Kearbey, but states that he had never manufactured a batch as large as twelve pounds. He therefore seeks a downward departure in sentencing based on the idea that if he were convicted of manufacturing a lesser amount of methamphetamine – such as the quarter-pound batches he had previously manufactured – he would receive a shorter sentence under the sentencing guidelines. Berg argues that, as informants, Hart and Kearbey would benefit under their cooperation agreement with the government if they induced Berg to commit a crime with a greater sentence. In order to help themselves, in other words, Hart and Kearbey wanted Berg to manufacture twelve pounds of methamphetamine.

We agree with Berg that the amount of drugs involved in sting and reverse-sting operations can be easily manipulated by the government and, as Berg also notes, courts have begun to question the government's power to control sentencing. "[W]e continue to be deeply concerned about the proclivity of reverse-sting operations . . . to raise questions of sentencing entrapment." United States v. Stavig, 80 F.3d 1241, 1247 (8th Cir. 1996). Although Berg legitimately raises the question here, we do not agree with Berg's construction of Hart's and Kearbey's conduct. There is no indication that they set Berg up to manufacture a greater amount of methamphetamine simply to enhance Berg's sentence. Additionally, it appears that Berg preferred to manufacture the greater quantity. In any case, no great amount of persuasion was required.

VI.

For the reasons discussed, we affirm both the conviction and the sentence imposed by the District Court.

BRIGHT, Circuit Judge, dissenting.

Because the district court erred in two respects, I dissent. First, on these facts, Berg's request for a jury instruction on entrapment should have been granted. Second, importantly, the district court erred in refusing Berg's request for a downward departure based on the government's manipulation of his sentence.

## I. Instruction on Entrapment

Entrapment is generally a question for the jury to determine, see United States v. Pfeffer, 901 F.2d 654, 656 (8th Cir. 1990), and when it is raised by the defendant as an affirmative defense "the government must prove the absence of entrapment beyond a reasonable doubt." United States v. Eldeeb, 20 F.3d 841, 843 (8th Cir. 1994) (citing Jacobson v. United States, 503 U.S. 540, 548 (1992)). Although a trial judge may refuse to give an instruction on entrapment in the complete absence of any evidence to support it, a defendant is "entitled to an instruction on entrapment, . . . if there was evidence that '(1) government agents implanted the criminal design in his mind, and (2) government agents induced him to commit the offense.'" Eldeeb, 20 F.3d at 843 (quoting United States v. Huff, 959 F.2d 731, 737 (8th Cir. 1992)).

Moreover, in order to prove the affirmative defense of entrapment, as a legal matter, the defendant must first demonstrate that the government induced him to commit the crime. See United States v. Cannon, 88 F.3d 1495, 1504 (8th Cir. 1996). When inducement is so shown, the prosecution then has the burden to show that the defendant was in fact predisposed to perpetrate the crime. See id.

-10-

Under the foregoing standards, the evidence presented at Berg's trial was sufficient to allow a reasonable jury to find entrapment. See Eldeeb, 20 F.3d at 843. Thus, the entrapment defense ought to have been submitted to the jury for its due consideration.

While the record is somewhat ambiguous on the question of whether the idea to manufacture methamphetamine originated with the government or with Mr. Clayton, Mr. Berg's sole alleged co-conspirator, there was certainly credible evidence to suggest that the government "implanted" the idea for this enterprise. (Trial Tr. 153, 401). Although one of the government's cooperating individuals did testify to the contrary, the resolution of such differences in testimony is within the province of the jury.

Moreover, there is ample evidence in the record to suggest that the government induced Berg to commit this crime. Prior to September 24, 1996, according to the testimony of Mr. Clayton, Mr. Berg had not agreed to manufacture methamphetamine. (Trial Tr. at 406). At the tape-recorded meeting of September 24, 1996, however, the government's agents made a variety of specific inducements designed to lure Berg into such an agreement. They offered him a safe location for the operation and assured him that it was in an area free from law enforcement activity. (Government Ex. 2 at 9). They offered him an overall plan to profit without any financial investment of his own. (Government Ex. 2). They promised to provide the most significant and helpful physical apparatus needed to "cook" a large batch of methamphetamine (namely, an enormous twenty-two-liter, triple-necked, chemical flask). (Government Ex. 2 at 9). In addition, they also offered to provide a regulated chemical precursor (hydriodic acid) which Berg otherwise could not obtain. (Government Ex. 2 at 4, 5, 7). All of these offers and provisions made on the part of the government were transparently designed to induce Berg to enter a conspiracy and ultimately to commit the crime.[3]

---

[3]The majority suggests that Berg was not induced by the government because he "readily agreed" to make methamphetamine and, when discussing the relative merits of making larger batches, indicated that he would "rather do it that way." Maj. Op. at

In counterbalance, the prosecution presented no direct evidence of Berg's predisposition to manufacture methamphetamine. Although it is true that the prosecution claimed that it possessed such evidence and considered introducing it, the prosecutor opted not to do so for purely strategic reasons. (Trial Tr. at 338, 391). The majority opinion rests its determination that Berg was not an "unwary innocent" on the fact that Berg "had specialized knowledge in manufacturing methamphetamine." (Maj. Op. at 7). It is clear, of course, that Berg <u>did</u> have knowledge of the chemical reactions necessary to cook methamphetamine. But mere knowledge of the requisite chemical processes does not, as a matter of law, create a predisposition in an individual. If it did, any chemist with sophisticated knowledge on the subject would be "predisposed" to manufacture methamphetamine no matter how unwilling to do so in fact.

A proper inquiry into a defendant's predisposition "requires examination of the defendant's personal background to see where he sits on the continuum between the

---

7 (citing Government Ex. 2, p. 14). My response to that is two-fold.

First, the affirmative defense of entrapment, at least in the context of a conspiracy crime, <u>presumes</u> that the defendant agreed to commit the offense. The fact that the defendant ultimately agreed, readily or not, simply does not inform the question of whether he was <u>induced</u> to agree. The court's focus when weighing the propriety of an entrapment instruction must, at the first step, be on what inducements were made and not on the agreement itself. The majority opinion does not address the specific inducements detailed in this dissenting opinion.

Second, Berg's preference to make larger rather than smaller batches does nothing to deflate the inducements made by the government. Berg's comment that he'd "rather do it that way" came near the end of the tape-recorded conversation. It was <u>earlier</u> in this same conversation that the government's agents made the very inducements which suggest entrapment and which appear to have persuaded Berg to enter the conspiracy. Berg's preference <u>after the fact</u> in no way impairs the coercive power of inducements made <u>prior in time</u> because, by the time he expressed his preference, he was already in the trap.

naive first offender and the streetwise habitue." United States v. Kummer, 15 F.3d 1455, 1459 (8th Cir. 1994) (internal quotation omitted). No such examination was conducted here.

Thus, Berg adequately showed that government inducements led him to commit this crime while the government failed to carry its corresponding burden to show Berg's predisposition. As a result, Berg was entitled to have an instruction to allow the jury to consider entrapment as a defense. I would reverse Berg's conviction on that basis and remand the case for a new trial.

## II.  Sentencing Entrapment and Manipulation

Alternatively, in considering Berg's attack on his sentence, many of the same factors which led to the conclusion that an entrapment instruction was warranted in this case support, with even greater force, a sentencing reduction for Berg on the basis of sentencing entrapment and manipulation.

In United States v. Barth, 990 F.2d 422 (8th Cir. 1993), this court recognized that the sentencing guidelines contain the "terrifying capacity for escalation of a defendant's sentence" as a result of government misconduct. Id. at 424 (quotation omitted). Due to the structure of the guidelines -- a structure which ties various illicit drugs to specific sentencing ranges based primarily upon the sheer weight or quantity of drugs present in a given offense -- relatively modest differences in the amount of drugs seized from or manufactured by a defendant may dramatically alter his or her time in prison. Yet at the same time, in many drug enforcement actions including this one, it is the government and not the defendant which maintains ultimate control over how much of a drug is bought, sold or otherwise swept into the offense. For this reason, "we [held] that sentencing entrapment may be legally relied upon to depart under the sentencing guidelines . . . ." Id. at 424-25.

-13-

In addition to sentencing entrapment, this court has also recognized and distinguished the theory of "sentence manipulation." United States v. Shephard, 4 F.3d 647, 649 (8th Cir. 1993) (citing United States v. Connell, 960 F.2d 191, 194 (1st Cir. 1992)). While sentencing entrapment focuses on the defendant's predisposition to commit only minor crimes, see United States v. Lenfesty, 923 F.2d 1293, 1300 (8th Cir. 1991) (defining sentencing entrapment as "outrageous official conduct [which] overcomes the will of an individual predisposed only to dealing in small quantities" for the purpose of increasing the amount of drugs and the resulting sentence) (emphasis added), sentencing manipulation instead requires the court to focus on whether the government tailored its "investigation merely to increase the sentence [defendant] would receive." Shephard, 4 F.3d at 649. In order to prevent law enforcement agents from vindictively ratcheting up a defendant's sentence, "[w]hen an accusation of sentencing factor manipulation surfaces, the judicial gaze should, in the usual case, focus primarily -- though not necessarily exclusively -- on the government's conduct and motives." United States v. Gibbens, 25 F.3d 28, 31 (1st Cir. 1994) (emphasis added). A defendant may argue theories of sentencing entrapment or manipulation in mitigation of sentence even if the affirmative defenses of entrapment or outrageous misconduct failed at trial. See United States v. Hulett, 22 F.3d 779 (8th Cir. 1994).

We properly test fact patterns for sentencing manipulation by examining the government conduct at issue to determine whether it served some legitimate law enforcement objective, or whether it was outrageous and aimed only at increasing the defendant's sentence. See United States v. Calva, 979 F.2d 119, 122-23 (8th Cir.1992); Barth 990 F.2d at 425. If it is the former, then the defendant should receive no relief from his sentence because the government may legitimately elicit additional offense conduct in order to further establish guilt, probe the depth and extent of a criminal enterprise, determine whether co-conspirators exist, or trace the chain of a criminal hierarchy. See id. If it is the latter, however, sentencing manipulation has occurred and a reduction is clearly justified and required.

In this case, Berg argues that he received a thirty-year sentence -- instead of a much shorter sentence -- because the government manipulated the quantity of methamphetamine produced by the conspiracy. Insofar as the evidence conclusively establishes that the DEA supplied a vital precursor chemical in an amount carefully calibrated to trigger the maximum penalty allowed by the sentencing guidelines,[4] I agree. In order to better understand why I believe Berg's sentence was improperly manipulated, it is important to explain a little bit about how methamphetamine is produced.

Methamphetamine may be manufactured by either of two methods. Although the precise reactions are complex, one method relies on a combination of ephedrine, red phosphorous, and iodine crystals. A second method relies primarily on ephedrine and hydriodic acid.[5] At Berg's trial, the DEA's chemist testified that he could produce a high quality methamphetamine yield, using either method, if the reactions were conducted under laboratory conditions. (Trial Tr. at 388-89). However, in the real world, "meth cooks" are not conducted under such controlled circumstances. On the street, apparently, it is understood among those who participate in the illicit manufacture and trade of methamphetamine that production by the hydriodic acid method is a big advantage. (Trial Tr. at 91, 405). This is true for at least two reasons.

_____

[4]The sentencing guidelines establish the base offense level for conspiracy to manufacture actual methamphetamine -- in a quantity greater than three kilograms (6.6 pounds) -- at 38. Thirty-eight is the highest base offense level provided for any pure drug crime. See U.S.S.G. § 2D1.1 (a)(3)(1998). Assuming that an offender has no significant prior criminal history (Criminal History Category I) and assuming that no enhancements are made to the base offense level, an offense level of 38 will yield a sentencing range of 235 to 293 months (in other words, between 19 years, 7 months and 24 years, 5 months). See id. at Ch. 5, Pt. A.

[5]Although hydriodic acid substitutes for the combination of red phosphorus and iodine in the main body of the reaction, red phosphorus and iodine are apparently still used in smaller amounts to bolster the reaction.

First, the hydriodic acid method is safer because, although these chemical reactions remain highly volatile, the hydriodic acid method is relatively less likely to explode during production than is its phosphorus-iodine counterpart. (Trial Tr. at 388). Second, under the sub-optimal manufacturing conditions in the field, the hydriodic acid method apparently produces a whiter, more desirable product containing fewer impurities. (Trial Tr. at 416).

Despite the obvious advantages of hydriodic acid, it is rarely used, as a practical matter, because the government has placed it on the "watch list" in order to discourage its use in making methamphetamine. (Trial Tr. at 387). Purchasers must present identification and sign assorted documents before they can obtain hydriodic acid. (Trial Tr. at 389). In other words, the process of buying hydriodic acid creates a paper trail that gives the DEA and local law enforcement a ready mechanism to spot potential drug manufacturers. As a result, only the foolish will risk detection by brazenly purchasing hydriodic acid for illicit use in the open market.

In this case, however, the DEA authorized Kearbey (its cooperating criminal) to make a deal with Clayton (the known methamphetamine trafficker) under which the DEA would requisition and supply the conspiracy with hydriodic acid. (Trial Tr. at 201, 276). This was unusual -- the authorizing agent had never previously done so. Id. As mentioned in Section I, Kearbey's access to hydriodic acid surprised Berg and even induced him to join the conspiracy because Berg could not get hydriodic acid on his own. (Government Ex. 2 at 5, 7). In addition to serving as an inducement, however, the hydriodic acid supplied by the DEA also functioned to control the ultimate amount of drug produced in the conspiracy because, as with any chemical reaction, the quantity of limiting input determines the quantity of yield. In turn, by controlling the amount of methamphetamine produced, the DEA controlled the range under which Berg would be sentenced.

-16-

When the government shut down the manufacturing operation in this case, 2.9 kilograms of methamphetamine were seized -- just under the threshold amount of 3.0 kilograms necessary to trigger the maximum sentencing range. (Trial Tr. at 375). When the district court concluded that "the intention [of the conspiracy] was to manufacture the maximum amount of methamphetamine consistent with all precursors and equipment present, which would be an amount greater than three kilograms" (Sentencing Tr. at 19) (emphasis added), it used the excess, unreacted hydriodic acid and the twenty-two-liter flask (both supplied by the DEA or its agents) to push the drug quantity for the offense above the maximum sentence threshold amount. In other words, the DEA and its agents knew precisely how much precursor hydriodic acid they needed to supply in order to manipulate this sting to produce the maximum possible penalty for Mr. Berg. Indeed, the DEA's prime investigator in this case, the man who personally authorized the use of hydriodic acid in this sting, also testified that he was personally aware that sentencing calculations would be made under the guidelines. (Trial Tr. at 228-29). In short, the evidence demonstrates that the DEA intentionally arranged the amount of precursor chemical supplied to this conspiracy and, thereby, ensured that Berg would face the maximum possible consequences.

Unlike the circumstances in Barth, 990 F.2d at 424-25 (law enforcement justified in purchasing additional drugs to ascertain source), or Calva, 979 F.2d at 123 (additional purchases justified, inter alia, by need to "probe the extent of the distribution ring"), no legitimate law enforcement objectives were served by the government's actions in this case. Additional hydriodic acid did not further establish guilt because guilt in the conspiracy was fully established as soon as Berg agreed to make methamphetamine and took a substantial step in furtherance of that agreement. Additional hydriodic acid did not help to probe the depth or extent of the criminal enterprise. Nor did it help to identify unknown co-conspirators or trace the chain of a criminal hierarchy because the government knew full well that -- in a crime it created out of whole cloth -- only Clayton, Berg and two government catalysts participated. Instead, the government's aim when it supplied Berg with such large quantities of drug

precursor was, figuratively, to put Berg in jail and throw away the key -- regardless of Berg's actual criminal intent. Thus, because Berg's sentence range was so obviously manipulated, he is entitled to a downward departure to a level which fairly reflects his culpability.

But even if I am wrong about the contours of "sentencing manipulation" per se, this court has also noted recently that "where the government's conduct directly results in prejudice to a defendant, which is significant enough to take the case out of the heartland of the guidelines, the district court has the discretion to impose a downward departure." United States v. Jones, 160 F.3d 473, 484 (8th Cir. 1998). At a minimum the district court ought to have employed its discretion under this principle to depart downward. The type of sentencing manipulation on display in this case is an insidious evil. Even if we give law enforcement wide berth, Berg was clearly and significantly prejudiced by the government's conduct. This type of government-created, government-manipulated crime is simply "outside the heartland" encompassed by the provisions of the sentencing guidelines because the Sentencing Commission simply did not contemplate, nor would it countenance, maximal sentencing as a law enforcement objective.

### III. Residual Issues of Policy and Fairness

I would also like to take this opportunity to add several other comments about the sentencing of Mr. Berg individually and others like him more generally.

First, the government created a criminal enterprise in this case which set up a small-time methamphetamine cooker. No doubt a jury could find Berg guilty and a sentencing judge could send him to prison for his conduct. But the magnified sentence imposed upon Berg, a sentence which will keep him in prison until his old age, is a direct result of the government's participation in Berg's criminal activity. The words of Justice Brandeis in Olmstead v. United States come to mind.

To declare that in the administration of the criminal law the end justifies the means -- to declare that the government may commit crimes in order to secure the conviction of a private criminal -- would bring terrible retribution. Against that pernicious doctrine this court should resolutely set its face.

Olmstead v. United States, 277 U.S. 438, 485 (1928) (Brandeis, J., dissenting). The government may conduct sting operations. But for it to engage in conduct that for the citizen would be criminal and thereby authorize the imposition of the harshest sentence on an obviously small-time lawbreaker represents government conduct at its worst, not its best. This court should set its face against such activity.

Next, while Berg is now but 33, he will emerge from the penitentiary an old man -- if he doesn't die there first. In the intervening years, the cost of his incarceration for the American taxpayer will total well over $660,000, not including the expense incurred to construct the institutions in which he and others like him will be housed.[6] As a matter of national policy, such costs can scarcely be justified as rational even when they are imposed by a discerning legislature. Such costs are made intolerable however where, as here, they are the product of prosecutorial zeal and law enforcement manipulation. I previously discussed the problem of what I believe to be costly and excessive sentences in United States v. Hiveley, 61 F.3d 1363 (8th Cir. 1995) (Bright, J., concurring), and I refer the reader to that case. I wrote in Hiveley and I repeat here:

[U]nwise sentencing policies which put men and women in prison for years, not only ruin lives . . . but also drain the American taxpayers . . . . [It is] time to call a halt to the unnecessary and expensive cost of putting people in prison for a long time based on the mistaken notion that such an effort will win "The War on Drugs."

---

[6]See, United States v. Hiveley, 61 F.3d 1363 (8th Cir. 1995) (Bright, J., concurring) (estimating the per prisoner cost of incarceration, excluding prison construction, for fiscal year 1995 at $21,995).

. . . .

The public needs to know that unnecessary, harsh and unreasonable drug sentences serve to waste billions of dollars without doing much good for society. We have an unreasonable system.

Id. at 1363, 1365.

Finally, although Berg makes no direct argument with respect to disproportionate sentencing, the result in this case is worth noting. The chain of events which culminated in Berg's arrest began in Arizona when Kearbey and Hart were arrested while trying to purchase fifty pounds (22.7 kilograms) of methamphetamine from an agent of the DEA and faced the possibility of maximum sentences, even life in prison. (Trial Tr. at 47, 149). Both Kearbey and Hart were long-time drug dealers who made hundreds of thousands of dollars in the process. (Trial Tr. at 49, 145). After they agreed to "cooperate" with the government, Kearbey and Hart created several sting operations for the DEA by fingering low-level acquaintances (such as Clayton) and relatives (Kearbey's brother-in -law, for example) (see United States v. Hunt, 171 F.3d 1192 (8th Cir. 1999)). After the stings were conducted, Kearbey was sentenced to two years of supervised release with time served; meaning Kearbey -- the ringleader of a fairly large methamphetamine distribution network -- was punished for his crimes with a total of seven days in jail. (Trial Tr. at 51). Hart, for his assistance, was sentenced to three years of supervised release with time served; meaning Hart -- for his participation in a crime involving 22.7 kilograms of methamphetamine -- was punished with a total of three days in jail. (Trial Tr. at 155). In stark contrast, note Mr. Berg -- the smallest fish in the kettle, a man who had no one else to snitch on -- suffers punishment for his crime with ten thousand, nine hundred and fifty days in prison.

What a sad kettle of fish![7]

## IV. Conclusion

In summary, I would set aside Berg's conviction for the trial court's failure to give an entrapment instruction. In the alternative, I would vacate the sentence of imprisonment and remand to the district court to reduce Berg's sentence to one appropriate for his usual practice or capability in manufacturing methamphetamine.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.

---

[7]The line originates in the Gilbert and Sullivan opera *Iolanthe* [1882], Act II. The play dialogue reads: "Here's a pretty kettle of fish!"